3-0-9-0-7-7-3 James Thomas DeHart v. Thomas Thomas Perris v. Blanca DeHart Mr. Perris, you may proceed. I reserve five minutes of my time for rebuttal. Thank you. May it please the Court, Tom Perris on behalf of James DeHart. I believe the parties don't disagree that for a period of more than five and a half decades, Donald DeHart held out James as his one and only son. The single day which we know of where that wasn't the case is the day he signed this will, where he said, I have no children. That's a troubling fact and one which I have pled, I think, a factually rich complaint as to why that occurred. I think there's three possibilities. One, the man did not have capacity to sign the will and did not know who James was at that point. Two, that there was undue influence being exerted over him by Blanca DeHart, his new wife. Or three, he intentionally did want to cut James out of his estate plan. That's an issue that need not be decided at this level, however, which of those three possibilities, or perhaps more, is true. What's before this Court is whether this complaint has been pled sufficiently. Is James an heir such that he has standing to bring this case? Early on there was a motion to dismiss specifically challenging that, that was denied on behalf of Blanca and the estate. That issue seems to have come up again and perhaps is the basis for the trial court's ruling. I think the recent case of U.S. Bank v. Lindsay dealing with how one establishes parentage is very instructive. And given that it cites back to a 105-year-old case, is the Illinois law for quite some time. And that is this general acknowledgement, and I certainly have pled a general acknowledgement. In fact, the man, while he was preparing for his death, making prearranged funeral arrangements, listed James as his son. He listed James' children as his grandchildren. He listed James' grandchildren as his great-grandchildren. So the man acknowledged there, and in many other ways. I've alleged in my complaint that indeed he gave this birth certificate, which is the subject of this controversy, to James. That Donald gave that birth certificate to him. That James used it throughout his lifetime, all the way up until the year 2000, when he sought to get a passport. And for the first time discovered that he was not the natural-born child of Donald. He had a conversation with Donald at that point, and as I've alleged in my complaint, Donald told him that there was a homeward lawyer who took care of everything legal, and that he was, in fact, adopted. Now, I have been unable to discover that birth certificate, and the record reflects that those who came before me back in 2000 tried to about that time as well, and have been unable to discover whether that adoption actually took place. Perhaps that's because it didn't. Perhaps that's because of the adoption laws and the difficulty and the secrecy around that. But in any case, as it stands now, we don't have a birth certificate or an adoption record that indeed reflects that this adoption took place. I've speculated why that may be, including speculation that perhaps back in the 1940s a gentleman agreement took place. Because obviously this was a secret that Mr. DeHart and his new wife took very seriously. In fact, throughout their lifetime, as I believe I've alleged in the complaint, they celebrated the anniversary of their wedding for years, but never told anyone how long they had been married. Why? Because that was just a little shorter than James had been born. And so out of love for him, they never did put a number of years on that. I think the complaint is very rich with details showing a very loving relationship that Donald and James had. Indeed, one year before, about a year and a half before all this, Donald took James and his extended family on a trip to Arizona. This was slightly before Blanca came into the picture. Spent a vast sum of money entertaining his child, his grandchildren, his brother, his sister, and his children, Donald's children and their spouses, and his great-grandchildren. All that is a public acknowledgment in many, many ways that Donald considered James his son. And that is perhaps the troubling issue, that he doesn't have a piece of paper, but he has all of these facts. Now, I've also alleged that there's a prior will, and that he has standing under a prior will. I stand ready, willing, and able to prove this existence of this prior will. I believe there will be witnesses who will testify as to this prior will. Right now, it's under the control, we believe, of Blanca in the farmhouse, and so we don't have access to it. But as I've alleged in the complaint, there are others who know of its existence, and I believe that that as well provides him standing to bring this suit. On the prior will, what theory are you going to use to get standing? What's your best theory, do you think, to go up with the prior will? Well, as Your Honor knows, an heir or somebody who would have taken but for this new will, and that that new will provided for his son, James, to heart, and that would give him standing to bring a will contest. Either one of those, and I believe both of those facts have been alleged here and can be proved in this case. So, the issue of incapacity and how that affects this case is really hardly yet, it's not, all that we're talking about is the pleading stage at this point. And I submit to you that when a man holds out as his one and only son for 50-some years and then says, I have no children, that's a fact, that's not a conclusion which has been, or a legal conclusion, that is a fact. And I believe that reasonable people would say the reason he doesn't know, the reason he would say that is because he doesn't know. And there's a lack of capacity. One doesn't forget their son. And even if, even if at that moment in time, James or Donald had decided that he wanted to disinherit James because there was some obvious friction going on between James and Blanca, then the law provides many ways to do that. All he has to say is, I have a child. He doesn't have to provide James anything in his will. He seems like he went to a reasonable lawyer who drafted this will. So why is it that that statement appears? Which, if I might then jump ahead and go to a point which I've raised in my brief and in the underlying case, is that I sent a subpoena to the drafter of this will hoping to get to the bottom of this very early on, a subpoena that was not honored, that was crossed because of attorney-client privilege. The attorney-client privilege is not applicable here. The law wants Donald to speak. We want to know Donald's will. We want to know his intentions. And one person who can tell us that, perhaps the best person, is the drafter of his will, Attorney Peters. And from the U.S. Supreme Court on down, this is an exception that is applicable in Illinois, and that deposition should have proceeded. And I think, as I've said in my brief, hundreds of pages that have been written about this case may not have been necessary if we could have gotten that deposition. And so another issue which has been properly framed is, was that ruling that the attorney-client privilege kept Attorney Peters from producing his file and or talking applicable? Because I believe, frankly, that the drafter of the earlier will, and I think I've alleged, probably who passed away, and we did send a subpoena out to that lawyer. His wife, the keeper of his records, couldn't produce anything. But I think the most logical place would have been in William Peters. And so that will may show up there. But in any case, the issue there is whether or not the attorney-client privilege exists in this context. And under Illinois laws, I've cited, it does not. We want to know Donald's intention, and that's one place that we can find that. Now, I've raised in my amended complaint other theories that are much more novel and I think unnecessary, but I raised them because I think they're appropriate. And that is contract for an adoption, which is a somewhat arcane principle of law, but one recognized in Illinois that in situations like this where we have what looks, smells, and acts like an adoption, that there must have been an adoption. And in equity, the court is not going to say no, that no adoption took place, even though it can't be proved. It seems a, frankly, somewhat artificial construct to impose over a relationship that this is a contract in a business setting. But Illinois law sets out those principles, and Illinois in the Monaghan v. Monaghan case, I think sets out principles that I have properly alleged and can be proven. I mean, there's simply not a dispute that for 56 years, James and Donald, well, 54 actually because I say it's about two years old, knew each other as father and son, and only that was known to the world. There was select and less than few people who knew this secret that there was an adoption that took place. And so the contract for adoption construct should be imposed upon this if for some reason the public acknowledgement, which I think U.S. versus U.S. bankers. Let me just ask you, do we know at this point, I guess we're pretty much at the pleading stage, whether James DeHart's biological father is still alive? I know from my investigation during this lawsuit, I have never spoken to him, but I did speak with a relative in southern Illinois at one point, but that's well outside of the record. But I do believe nonetheless that it will come out through witnesses who I have spoken with, and indeed Virginia Boswell, James's mother, as a young woman became pregnant by Thomas Staley, and they ran off to Indiana, got married, and that relationship ended rather quickly. Well, I guess where I was going was if A tells his child that I'm your dad for 55 years, and then he believes and gives him a birth certificate, you're also prejudicing that kid in another way, because he's not going out and trying to inherit from his real biological father because he thinks this guy is his legal father. And it seems to me that this is another area of prejudice that your client might have suffered. It may be, although I think one is always a, this isn't directly relevant for this case, I don't think, but I think there is case law that talks about you're always the child of your biological parents for purpose of inheritance, even if an adoption takes place. So where Mr. Staley is in this and whether James could inherit from him, I don't know, but it is an interesting question. So outside of the contract for adoption, which they say is somewhat of an artificial construct on this relationship that I'm not entirely comfortable with because a contract generally is between bargaining parties, and there's no bargain going on here between these parties. But the Illinois Supreme Court many years ago came up with that, and I think properly so. There are case law that talks now about an equitable adoption that Illinois is silent on, but likewise I think could be used by this court to establish this adoption that took place. I don't think that's a question of fact for a jury down the road. I think that I've pled a sufficient case and that if proved that the trial court would make that ruling. Counsel, you have two minutes. Thank you. And finally, there's cause of action pled for fraudulent inducement and intentional interference with expectancy. I've pled, and I don't think there will ever be a debate about this, that there was a power of attorney that Blanca had, and that Blanca during her brief marriage to Donald exerted considerable control over his financial affairs, a state which he had not known during his other life, the rest of his lifetime. Donald, in fact, was the owner of an 80-acre parcel of farmland that was sold to, most of which was sold to a developer to provide acres that his farmhouse remained on. And most of that before Blanca got involved, thereafter, as the complaint alleged, once Blanca was involved, she took over his financial affairs. She was the guardian of the front door, the guardian of the telephone, the guardian of the mailbox, in all respects exerted tremendous control over Donald DeHart. That fact coupled with that power of attorney making her a fiduciary and now seeing her as the sole beneficiary of this will, I'm sorry, about 99% beneficiary of this will, and James being a 0% beneficiary of this will, I think all support the cause of action for intentional interference with expectancy or fraudulent inducement. Thank you. And the new will was written, what, two, two-and-a-half months before the testator's death? Indeed. On the one-year anniversary of Blanca and Donald's marriage, it was apparently signed, and he died a few months thereafter in Florida. Thank you. Thank you, Mr. Pierce. Mr. Sherman, you may respond. May it please the Court. Your Honors, my name is Ed Sherman. I'm here today on behalf of the estate of Donald DeHart and Blanca DeHart. With respect to the issues before this Court on appeal, two of them that were mentioned by counsel for James DeHart were not argued in the briefs, and I submit that they were waived, the ones on fraud and the inducement and tortious interference with expectancy, Your Honors. So with respect to those issues, I don't think those are issues that the Court needs to address at all on this appeal. If the Court has questions about them, notwithstanding that I think they're waived, I will address the issue substantively, but since they are waived, as far as I can tell, I don't see the need to go into them. Working backwards here a little bit as well with respect to the motion to compel, just to get that out of the way, as Your Honors are aware from the record on appeal, this occurred in 2008. There is no, the subpoena that is discussed by counsel for Mr. DeHart, that's not part of the record on appeal, so there's nothing for this Court actually to review. The Court's order talks about denying a motion to compel a subpoena for documents. However, the motion to compel is for testimony. So on either of those bases, it's proper for the Court to affirm the trial court on the standard of abuse of discretion. With respect to the substantive parts here on the motion to compel as well, first of all, the parties weren't an issue, and essentially by having the motion to compel done in such a way that before the parties are at issue, you're essentially asking for discovery to conduct prior to actually having the parties at issue and answering the complaint. But most importantly, the substantive part of the motion to compel, there is an attorney-client, there's an exception to the attorney-client privilege in order to find out the intent of the deceit with respect to will contest, but the parties that can raise that privilege are the parties who have standing as next of heir or kin. And with respect to the record on appeal, there's nothing regarding that specific motion in the Court's order where it's even argued, alleged, or anything of that nature regarding James DeHart being either the next of kin or heir. So therefore, based on the lack of a record on that, there is no reason for this Court to reverse the trial court on that issue of the motion to compel. How do we know at this stage that there was never an adoption? Oh, an adoption? As far as a matter of record, well, Your Honors, as you're probably aware, the complaint catches two exhibits, B and C. C is the more recent birth certificate, which shows James Thomas Staley Sr. as the birth father. And according to, I believe, is it 410 ILCS 53517, talks about the methods for if you have an adoption, a certificate of adoption, it goes to the state registrar. The state registrar is supposed to change the name of the birth parent to the adopted parent. The only record since 2000 when the actual document was received is the one showing James Thomas Staley Sr. as the parent. Two and a half years since litigation, nine years, ten years probably up to today, no record has been procured to show that the records of the state registrar are inaccurate. Well, as you point out, we're not even at issue yet. I mean, if we do have a birth certificate saying Thomas or Donald Lehart was the father. The birth certificate, I believe, was, according to the allegations of the complaint, was something that was given to Jim early in his life. However, Your Honors, as you're aware, the Exhibit C was basically obtained in 2000. It's a more recent document. And based on that alone, you know, it appears that no adoption had taken place. If counsel, you know, wanted to go ahead and prove or allege that somehow the registrar's records are wrong or something like that, he could have done a FOIA request. He could have done something else. He's had so much time to try to establish that fact, even up to today, and nothing's been procured. Although a minute ago you were arguing that he couldn't get discovery because you weren't at issue yet. Well, that doesn't prevent him. I'm sorry, Your Honor. It doesn't prevent him from going to the state registrar and saying, hey, look, I got this document in 2000. Is this really what the records are? Or going to the circuit court, wherever this occurred, going through all the records, finding the actual adoption that took place. There is no record. There's nothing that prevents him from going ahead to a FOIA filing and playing it up to today, from going to the court where this alleged adoption occurred, or going to the registrar or any public entity and finding it. And we're sitting here nine years from that date, and there's no record of it. Matter of fact, he's stated that it's very likely he'll never find that record, and that that's something that's important for the court to consider. Working backwards here, though, Your Honor, with respect to the adoption or the claim of parentage, those matters the court doesn't necessarily have to address if it finds that the complaint on the will contest issues that are properly before the court, the incapacity claim and the undue influence claim, if the trial court is correct and they're factually insufficient, because there is no claim for things such as Social Security benefits or something like that before the court. The only reason for these allegations is to the extent they relate to the substantive will contest. And if the substantive will contest is insufficient, factually pled, then there's no need for this court to get to those issues. And your argument is that you've got to be in error of law. You're going to have standing and, in essence, be in error of law to bring a will contest? Well, the standing issue, Your Honor, is I think that if you look at the last 260T motion to dismiss, standing wasn't an issue as part of the matter of the record before appeal. There's an allegation of a prior will. For purposes of what we're here for today, there's an allegation of a prior will, and counsel has mentioned that you can have standing under a prior will. However, the factual complaints regarding the alleged actions on the part of Blanca DeHart and the lack of any actual allegations regarding any impact it had on Donald DeHart, those issues, if the trial court was correct in finding that they were insufficient as factually pled, the court doesn't have to get to the adoption of the other issues. And that kind of leads to the most important part of this case, and we've got two issues, testamentary capacity and undue influence. As the court's aware on testamentary capacity, there's three things that are needed. One, you have to show that the person is not the natural object, that the person doesn't recognize the natural objects of their bounty. Two, that they don't know the kind and character of the property. And three, that they are not disposed of it according to some plan formed in their mind. There's no allegations in the second amendment complaint regarding the second issues, kind and character of the property and plan formed in the testator's mind. Those aren't addressed or alleged as being part of the testamentary capacity in the second amendment complaint. So on that basis alone, testamentary capacity was an insufficiently pled complaint as a matter of law. Now, if you're getting to the natural objects of the bounty, notwithstanding that, if you look at the actual allegations in the complaint and how that works, the statement by Donald DeHart that he has no children, the way we look at this here, we've got James DeHart having a birth certificate confronting Donald DeHart, according to my recollection of the allegations in 2000, showing James Thomas Daly Sr. as the father. You know, at that point there, Donald has something in his, he showed something, hey, look, this didn't actually occur, I'm not really the, you know, this adoption must have not gone through or something of that nature. And from that period forward, it's entirely possible that Donald DeHart, according to the allegations here, James put in his mind that Donald DeHart never actually completed that adoption. With respect... The fact that there was a, A and B have a child, okay? There's a birth certificate. Sometime later, somebody else adopts a child, okay? You're going to have two birth certificates out there, right? The first one doesn't disappear. So if someone later adopts a child... And then oftentimes they go back now, and the thing is, in a reissue of a birth certificate, at least one happens very young. But if the child's very young, what they do is oftentimes a new birth certificate is issued. Right. We don't have, I mean, we've got the record. There's no evidence of a new birth certificate ever being issued in this case. On top of it, there's no record of anything like, even if you can't find that, well, go to where it occurred. If it was handled by an attorney, go to the courthouse. Go look through the archives. Go look through the records. Find something. There's nothing to indicate this occurred. There's nothing there. But most importantly, I'd like to mention is, with respect to testamentary capacity here, moving on to undue influence, I guess now is, and I think that's actually the heart of the Second Amendment complaint, is the undue influence claim. Obviously, the court knows you have to show that the testator's free will was overcome, such that it's not according to his own plan. There's a litany of allegations in the complaint alleging what Blanca DeHart did. There's no allegations of how those relate to the will being executed eventually. Specifically, things regarding bank accounts. I mean, we've got spouses here. I'm sorry, I didn't write the log of it. I can't pronounce it right. In there, you've got spouses. Just because a spouse is related to somebody else doesn't mean necessarily that, you know, they're engaging in acts such that they're influencing each other unduly. And the fact that a husband and a wife have joined bank accounts doesn't really add up to much of anything. With respect to the issue of real estate dealings, power of attorney, where is the connection between that and the ultimate execution of Donald's will? And more importantly than the facial allegations with respect to Blanca's, how did it influence Donald? I mean, if you look at the cases cited by the parties, you look at In re Hoover, which is cited by us in our brief as well as counsel, you've got a case where someone basically is told a series of lies and misrepresentations that goes to their core beliefs such that, you know, that's a code of conduct. They disinherit someone. But more importantly than that, factually in that case, you have a diary. And on top of that, you have basically some kind of allegate. Something's actually existed that shows how the person internalized or was affected by it. There are no allegations of how Donald was affected if at all by these actions of Blanca. As a matter of fact, the second amendment complaint talks about the fact that up to and including today the execution of will, their loving and caring relationship in paragraph 14 still existed. So there was really nothing there facially to connect the dots. With respect to the issues of fiduciary. Go ahead. If you're thinking he's missing a couple of facts, assuming that's correct, why wouldn't he be getting a leave to amend his complaint? Well, that's an interesting question, Your Honor. In this case here, the court's freely allowed leave to be granted. There was two cases. He did it three times. There's two cases. But more importantly, on appeal here, counsel has not even argued the fact that, hey, look, the trial court abuses discretion. We should be granted leave to file. He wants to stand on this complaint. If he wanted to argue abuse of discretion, he could have done that in the brief and on appeal to the trial court. Also, it's not part of the, you know, on the appeal, it's not part of the thing before the court. If he wanted to have argued it, he had a chance. He wants to stand on the plea. It's factually insufficient. He failed to connect the dots. So there's really nothing as far as the need to send it back to the trial court. It's either sufficient based on what he pled or it's not. With respect to the issue of imposing trust, as far as the fiduciary duty, you have to show fiduciary relationship. We have a husband and a wife. Enric Lagbizek, and I'm terrible at pronouncing this, talks about the situation that husbands and wives influence each other all the time. Just a mere husband and wife relationship is not itself sufficient for a fiduciary relationship. Real estate holdings. How does that relate to the execution of the will? If we compare this case to In re Russell, cited by the appellant here, in that case, there's allegations or there's facts that are actually in existence that show that the party who was unduly influenced had his everyday needs taken care of, was in, I don't know if he was in field by old age or whatever, but there was actually showing of actually how this person's condition was. And actually, in this case here, there's nothing that indicates that Donald DeHart didn't have full faculties or that he was dependent on everyday needs from Blanca DeHart. But didn't he plead that he isolated him from the rest of the family and that she isolated him from the rest of the family? And let's face it, I mean, the facts are she's 30 years younger. She shows up, marries him 14 months before he dies, and two months before he dies, there's a new will and she gets virtually all of it. Well, that's nice. And in the process, she isolates him from the rest of the family, which is kind of classic set of facts related to undue influence. But you need to parse the factual pleas from the conclusory allegations in this case. And I don't believe that the factual pleas help establish and connect all those dots. I think that's what the most significant thing missing is the connection of the dots. We've got specific things in this second amendment complaint, but there's no allegations. Thank you. There's no allegations exactly how the dots are connected here. So I think on that basis, then, Your Honor, I'll just leave the complaint to yourself because that's the most important thing on this appeal. But I don't think the dots are connected here if you look at the factual allegations. With respect to the adoption and parentage issues, I'd just like to mention the fact that U.S. Bank v. Lindsay is addressing, I believe, under the Parentage Act. It deals with the Parentage Act as far as some of those issues in there. That was not something – there's no allegations of the Parentage Act. But under the Parentage Act, you get three things. You can prove that you're a parent-child relationship by birth of the mother, establishing the natural father through acknowledgement, which would be like a paternity test. And the third thing would be by adoption. Those are the three things. There's nothing in U.S. Bank v. Lindsay that's monumental or new between when this case was at the trial court and now. In this case here, we have a situation where we get the vital records, and it was produced by James DeHart himself. It shows that the actual adoption didn't occur. With respect to contract for adoption, I'll just really quickly point out, you've got to show clear and definite terms of the contract. You have to show the consideration. None of that's here. He doesn't know if it's an implied or an express contract. No case in Illinois that we've cited specifically deals with a situation where both birth parents' rights were not terminated when they found a contract for adoption. And I'd point the court to Inouye Staley, which I believe the facts are almost exact, very close to on point, where the person held the birth mother, moved in with the decedent. The decedent held out the child as his son his whole life, passed away, and the court found that there were no specific terms and the requirements for contract weren't shown, and it was just as sufficient the person was raised in a good home. And that was a motion to dismiss case. And they found that it was insufficient, which is the same posture as this one here. Finally, equitable adoption, really quickly, Illinois doesn't recognize it. The other states cited in the brief by counsel for James DeHart, if you look at those ones that deal with will issues or anything like that, there is also a contract for adoption. It's more of a nomenclature issue than otherwise. One quick question on equitable adoption. Has Illinois specifically rejected the notion of equitable adoption? Illinois has not recognized or rejected it to the extent of my research. However, Illinois has two things. You've got adoption, contract by adoption. Both require the party who is having that claim against them to actually take an affirmative act of saying, hey, look, you know, I'm going to have to go through a proceeding on a due process or a contract where someone enters into a contract. It isn't a situation where you have someone who's out there that basically is entering into a relationship where someone moves into a home, they take care of them, but don't actually intentionally during their life intend to take on that role and obligation from a legal theory's perspective. And so if Illinois adopts just holding oneself out as an equitable adoption and allows it, then it's eroding away the whole principles of the Adoption Act, which is done by the legislature as well as the extent contract for adoption is basically allowed in the state. And I think that that would be a matter that would be more suited to the legislature and allowing people to know their rights before having them enter into something which maybe they didn't intend to do. Thank you. Thank you very much. Thank you, Mr. Sherman. Mr. Parrish, you may reply. Following up on some of your questions and points, at page 80 to 86 in the record, you'll find a motion to obtain original birth certificate. My recollection is that motion was simply entered and continued. I could never or may have been denied. Indeed, there is a safe in Springfield that a woman keeps where the, if there was an original birth certificate, it would be. And in that motion at page 80 to 86 of the record, I asked for an order because that's what I was told. If you have an order, I'll give it to you. I mean, she wouldn't tell me whether or not it was there or not. But there is a safe that holds those that are not destroyed, those original birth certificates. And I believe the record reflects that. With respect to the statement, I have no children, indeed, it's possible that he thought that and that's why he signed that. But that's a question of fact far from this motion to dismiss. And even if it's true, it doesn't eliminate and I think it supports the possibility that Blanca put that into his mind, not anyone else. I think Blanca is under influence over him. And with respect to that proximate cause element, at paragraph 22 of count two, I say succumbing to Blanca's influence and then go on. I think that is the proximate cause that counsel indicates is not present. Of course, there's other proximate cause allegations with respect to incapacity. Regarding the cases that are cited by both parties in this brief, really, they're not motion to dismiss cases. These are principles that after someone's had an opportunity to further discover this case. And indeed, I do think that I've pled about as much as I can plead. And I think I've pled the proximate cause element, which counsel says is lacking in this case. And so it's not my desire to file a new complaint because I think this complaint is sufficient. And I think it has all the elements. But if for some reason the proximate cause element, which seems to be pointed out today, is weaker than necessary, of course I would. But I think it's in there. And proximate cause is always a question of fact. That's not an issue for the law to decide generally. That's for a trier of fact, whether this be a jury or a bench trial down the road. And so I do believe this complaint should stand. And I believe James DeHart should be able to go forward and discover his case through many means, some of which I've been stopped at already. Thank you. Thank you, counsel. Thank you, counsel, for your arguments in this matter this morning. It will be taken under advisement.